UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James Bender, Roy R. Hewitt,
Craig Mataczynski, John Noer, and
David Peterson,

          Plaintiffs,

    v.

Xcel Energy, Inc., in its corporate
capacity and as plan sponsor and
administrator of the Xcel Energy, Inc.
Deferred Compensation Plan,

          Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 04-3117 ADM/JGL

---

Maurice W. O'Brien, Esq., and Meg Luger-Nikolai, Esq., Miller-O'Brien, P.L.L.P., Minneapolis, MN, argued for and on behalf of Plaintiffs.

Timothy R. Thornton, Esq., Briggs & Morgan, P.A., Minneapolis, MN, argued for and on behalf of Defendant.

---

## I. INTRODUCTION

On April 21, 2005, oral argument before the undersigned United States District Judge was heard on Defendant Xcel Energy, Inc.'s ("Defendant" or "Xcel Energy") Motion for Summary Judgment [Docket No. 21]. In their Complaint [Docket No. 1], Plaintiffs James Bender, Roy R. Hewitt, Craig Mataczynski, John Noer, and David Peterson allege Defendant improperly denied them benefits owed under a deferred compensation plan governed by the Employee Retirement Income Security Act ("ERISA"). Defendant's Motion for Summary Judgment is granted in part and denied in part.

## II. BACKGROUND[1]

The Plaintiffs in this action are former senior officers of NRG Energy Inc. ("NRG"), all released from employment in June 2002 following financial turmoil that eventually led to bankruptcy at NRG. Plaintiffs now seek deferred compensation under the NSP Deferred Compensation Plan ("Top Hat Plan"). The main issue of contention is whether NRG or Xcel Energy is responsible for the payments allegedly owing to Plaintiffs.

In August 2000, Xcel Energy was formed when NSP and New Century Energies, Inc. merged. Sanford Aff. [Docket No. 25] ¶ 2. NRG had been a wholly owned subsidiary of NSP until June 2000, when an initial public offering sold stock in NRG to outside investors. Id. Following the public offering, NRG expanded rapidly, and eventually encountered severe financial difficulties in 2002. Id. ¶¶ 2-3. Ultimately, Xcel Energy bailed out NRG by purchasing the publically held stock, which was reacquired in a stock-for-stock exchange. Id. ¶ 4. NRG stock options were converted to options to purchase shares of Xcel Energy stock. Id.

The Top Hat Plan was established in 1980 and restated on the first of January of 1992, 2000, and 2002 (the "Plan Statements"). Id. Exs. A, B, C. NSP was the original Principal Sponsor of the Top Hat Plan, replaced by Xcel Energy following the merger of NSP and New Century. Id. Since 1992, every version of the Top Hat Plan has contained language indicating the source of payments due under the Plan.

---

[1] For purposes of the instant Motion, the facts are viewed in the light most favorable to Plaintiffs, the nonmovants. See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

In addition to participation in the Top Hat Plan, Plaintiffs[2] were beneficiaries under the NRG Executive Officer and Key Personnel Severance Plan (the "Severance Plan"), which became effective on May 31, 2001.  O'Brien Aff. [Docket No. 40] Ex. D.  With the exception of Plaintiff Peterson, all Plaintiffs were covered by the Severance Plan.  The Severance Plan required Plaintiffs to sign a release to vest the benefits.  Id. ¶ 11.2

After NRG released Plaintiffs from their employment in June 2002, they received confirmation from Xcel Energy regarding their severance pay.  Bender Aff. [Docket No. 35] ¶ 11, Ex. I; Hewitt Aff. [Docket No. 36] ¶ 8, Ex. A.; Mataczynski Aff. [Docket No. 37] ¶ 11, Ex. D; Noer Aff. [Docket No. 38] ¶ 9, Ex. B.  The confirmations instructed Plaintiffs to sign and return releases in order to vest severance benefits.  Id.  Plaintiffs Hewitt and Noer executed releases in order to vest their severance benefits. Sanford Aff. Exs. N, O.  The releases purported to release Xcel Energy from "any and all claims, complaints, causes of action or demands of whatever kind . . . against [Xcel Energy] arising out of any actions, conduct, behavior or events occurring to the date of . . . Release . . . ."  Id.  Plaintiffs Bender and Mataczynski also submitted releases; however, they were not the releases prepared by Xcel Energy.  Bender Aff. ¶ 12; Mataczynski Aff. ¶ 12, Ex. E.  On August 6, 2002, Plaintiffs received letters from Xcel Energy stating that Plaintiffs' severance would not be paid.  See, e.g., Bender Aff. Ex. C; Hewitt Aff. Ex. B; Noer Aff. Ex. C.  In response, in October 2002, Plaintiffs filed a lawsuit in federal court against NRG and the Severance Plan for failure to pay severance.  Basting Aff. [Docket No. 24]  Ex. B.

---

[2] Plaintiff Peterson had a separate severance agreement; therefore, the term "Plaintiffs" will refer to all Plaintiffs with the exception of Peterson when referencing the Severance Plan.

When Plaintiffs did not receive their severance benefits, they forced NRG into involuntary bankruptcy. During the bankruptcy period, Plaintiffs agreed to accept half of the benefits due to them under the Severance Plan. Basting Aff. Ex. C. The release signed by Plaintiffs carved out an exception for any claims Plaintiffs held against Xcel Energy related to the Top Hat Plan or stock options. Id. The agreement signed by Plaintiffs also purports to reserve claims against Xcel Energy. Id.

Plaintiffs have continued to pursue the benefits not yet received. On June 13, 2002, the administrator of the Top Hat Plan responded to information requests submitted by Plaintiffs, informing them that NRG, not Xcel Energy, was responsible for any remaining payments due to Plaintiffs. Sanford Aff. Exs. D-H.

### III.  DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995).

B.   **Effect of Plaintiffs' Releases on ERISA Claims**

Defendant first moves for summary judgment on the grounds that the releases signed by Plaintiffs during the NRG bankruptcy proceedings forestalls any further action against Xcel Energy.  Specifically, Defendant avers the settlement agreement in the NRG bankruptcy action fails to meet validity requirements of a Pierringer release.  Defendant also contends Plaintiffs Hewitt and Noer's releases, signed to vest their severance benefits, release Xcel Energy from liability.

1.   **Bankruptcy Release**

The Minnesota Supreme Court has summarized the elements of a Pierringer release as follows:

> (1) The release of the settling defendants from the action and the discharge of a part of the cause of action equal to that part attributable to the settling defendants' causal negligence; (2) the reservation of the remainder of plaintiff's causes of action against the nonsettling defendants; and (3) plaintiff's agreement to indemnify the settling defendants from any claims of contribution made by the nonsettling parties and to satisfy any judgment obtained from the nonsettling defendants to the extent the settling defendants have been released.

Hutchinson Utils. Comm'n of City of Hutchinson v. Curtiss-Wright Corp., 775 F.2d 231, 241 n.9 (8th Cir. 1985).[3]  Pierringer releases, as indicated by the first element listed above discussing negligence, are used in the context of tort law.  See John E. Simonett, Release of Joint

---

[3] Defendants assert Minnesota law guides this issue, as no federal precedent exists to provide guidance on this point of law.  See Chemung Canal Trust Co. v. Sovran Bank/Maryland, 939 F.2d 12, 16 (2d Cir. 1991); Morais v. Central Beverage Corp. Union Employees' Supplemental Ret. Plan, 167 F.3d 709, 711-12 (1st Cir. 1999) (state law does not govern federal common law, however, state law principles are reflected by it).  Plaintiffs do not dispute Defendant's choice of law analysis; therefore, Minnesota law will be applied as a guide.

Tortfeasors: Use of the Pierringer Release in Minnesota, 3 Wm. Mitchell L. Rev. 1 (1977).

The release at issue, executed on February 13, 2003, states in part:

> It is expressly understood that none of the terms of this Agreement in any way constitutes a waiver or compromises of any claims or rights that any of the Creditors may have with respect to NSP or Xcel, including but not limited to, claims for deferred compensation, pension benefits, . . . as well as any rights to stock or stock options, whether vested or not, under any stock plan or grant of stock, maintained by either of those two companies, including NRG stock or options that were previously converted to Xcel Energy, Inc. stock or options . . . .

Basting Aff. Ex. C. The release was part of a settlement involving Plaintiffs' claims against NRG regarding the Severance Plan. Id. Two factors derail Defendant's argument that the release is an invalid Pierringer release. First, this case involves no tort claims. Rather, Plaintiffs brought this lawsuit alleging ERISA violations and breach of contract. As a result, Plaintiffs were under no obligation to obtain a release that comported with Pierringer requirements. Second, the release cited by Defendant clearly and specifically excludes claims by the creditors for deferred compensation, pension benefits, and any rights to stock or stock options. In the instant lawsuit, Plaintiffs are seeking recovery under benefits denied them under the Top Hat Plan, which is a deferred compensation plan, and under stock option plans. Compl. ¶¶ 51-69. Plaintiffs make no claim for relief under the Severance Plan. As a result, the release does not bar Plaintiffs' claims.

### 2. Hewitt and Noer Releases

Defendant further argues that the releases executed by Plaintiffs Hewitt and Noer in exchange for the vesting of their severance benefits bars any claims they have against Defendant. The releases purport to discharge and waive "any and all claims, complaints, causes of action or demands of whatever kind . . . against the Company, Xcel Energy, Inc. . . . arising out of any

actions, conduct, decisions, behavior or events occurring to the date of Release . . . ." Sanford Aff. Exs. N, O. Defendant contends that, because the release is universal, it serves to bar the claims of Plaintiffs Hewitt and Noer. Plaintiffs argue the releases are invalid for two reasons. Plaintiffs first aver the releases were never accepted by Xcel Energy, as Xcel Energy refused to pay Plaintiffs the amount owing to them under the Severance Plan. Furthermore, with respect to Plaintiff Noer, it does not appear Xcel Energy or NRG executed the release. Sanford Aff. Ex. O.

Plaintiffs also argue the releases fail for lack of consideration. Sufficient consideration must support a release. Burns v. N. Pac. Ry. Co., 134 F.2d 766, 770 (8th Cir. 1943); Couillard v. Charles T. Miller Hosp., Inc., 92 N.W.2d 96, 101 (Minn. 1958). Although on its face, the release evinces consideration – namely, the fact that Plaintiffs Hewitt and Noer were to receive severance benefits in exchange for the release – the consideration was not forthcoming from Defendant. As a result, Xcel Energy gave no consideration for the releases signed by Plaintiffs. Given the failure of consideration, the releases signed by Plaintiffs are void.

**C.      Claims Discharged in the NRG Bankruptcy**

Defendant next argues that if Plaintiffs did not effectively release their claims in the severance settlement, Plaintiffs' claims were discharged in the NRG bankruptcy plan. On October 11, 2003, the Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Plan was filed, followed shortly thereafter by an order confirming the plan, filed on November 24, 2003. Basting Aff. Ex. O. The confirmation order served to release Xcel Energy from certain claims. Id. at 19. The discharge language provides:

> EACH HOLDER OF A CLAIM (WHETHER OR NOT ALLOWED) AGAINST, OR EQUITY INTEREST IN, THE DEBTORS OR THE NON-NRG PLAN DEBTORS (INCLUDING A CLAIM ARISING AFTER THE PETITION DATE THROUGH THE EFFECTIVE DATE OF THE NRG PLAN), AND EACH ENTITY PARTICIPATING

> IN EXCHANGES AND DISTRIBUTIONS UNDER OR PURSUANT TO THE NRG PLAN, AND EACH ENTITY AFFIRMATIVELY MAKING THE RELEASE ELECTION FOR ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, TRANSFEREES, CURRENT AND FORMER OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES, IN EACH CASE IN THEIR CAPACITY AS SUCH, SHALL BE DEEMED TO HAVE RELEASED ANY AND ALL OF THE NRG RELEASED CAUSES OF ACTION AND SEPARATE BANK CLAIMS AGAINST THE RELEASED PARTIES.

Id. at 35-36. The parties do not dispute that Plaintiffs held a claim and that Xcel Energy was a released party. However, an issue arises as to whether Plaintiffs' claims were among those released, as the discharge specifically excludes "any claims against Xcel under . . . the Employee Matters Agreement . . . ." Basting Aff. Ex. N at Ex. F. Plaintiffs argue their claims fall under the Employee Matters Agreement, which provides:

> With respect to the Xcel Energy Inc. Nonqualified Deferred Compensation Plan and the Xcel Energy Inc. Nonqualified Pension Plan (collectively, the "NQRPs"), NRG and Xcel will determine prior to the Effective Date the proportion of the obligations owing thereunder as of the Effective Date to individuals employed by NRG or any NRG Subsidiary as of the date hereof ("NRG NQRP Participants") that is legally allocable to Xcel by virtue of the NRG NQRP Participants' prior service with Xcel and/or Northern States Power Company (the "Xcel NQRP Amount"). To the extent Xcel has not previously satisfied such obligation, Xcel will maintain responsibility for payment of the Xcel NQRP Amount to which the NRG NQRP Participants become entitled under the NQRPs, and NRG will have no obligation or liability for payment of such amount.

Sanford Aff. Ex. T. The exclusion of claims under the Employee Matters Agreement raises a question of fact as to whether Plaintiffs' claims were discharged, as Defendant claims they were. Most of the Plaintiffs worked for both NRG and Xcel or NSP, with the exception of James Bender. Pls' Mem. in Opp. to Def's Motion For Summ. J. [Docket No. 34] at 2-3. Therefore, in construing the exception to discharge in a light most favorable to the Plaintiffs, their claims could survive the bankruptcy discharge, as they appear to qualify as "NRG NQRP Participants" who may still be owed money by Xcel. Because the existence of the exclusion raises a question

of fact as to whether Plaintiffs' claims apply, Defendant's Motion is denied.

**D.      Merits of the ERISA Claims**

The heart of Plaintiffs' claims lie in their allegations that Defendant violated ERISA regulations in denying them benefits. Plaintiffs seek relief under 29 U.S.C. § 1132(a),[4] which allows participants in an ERISA plan to sue to recover benefits due.

As a threshold matter, a reviewing court analyzes a decision to deny benefits under the abuse of discretion standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, if a plaintiff can demonstrate the existence of a conflict of interest or a serious procedural irregularity that ultimately caused a breach of the plan administrator's duty, a court may employ a "sliding scale" abuse of discretion standard. Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). The conflict of interest or procedural irregularity must have "'some connection to the substantive decision reached.'" Id. at 1161 (citations omitted). In short, the sliding scale standard allows a court to "simply adjust for the circumstances." Id.

Here, Plaintiffs aver that evidence exists that demonstrates both a conflict of interest and procedural irregularity. Plaintiffs contend that Defendant based its decision to deny Plaintiffs benefits on the 2002 Plan Statement, which was not approved until after Plaintiffs' discharge. Specifically, Plaintiffs argue that application of the 2000 Plan Statement, in effect at the time of their discharge, required the payment of their benefits, unlike the 2002 Plan Statement. Following the passage of the 2002 Plan Statement, which was not approved by Plaintiffs, Defendant applied the amendments retroactively to deny Plaintiffs' claims. According to

---

[4] In their Complaint, Plaintiffs' ERISA count cites 29 U.S.C. § 1056(a). However, the parties appear to be in agreement that 29 U.S.C. § 1132(a) is the applicable law. Future submissions should reflect that Plaintiffs' ERISA claim is brought under 29 U.S.C. § 1132(a).

Plaintiffs, this retroactive application of the 2002 Plan Statement constitutes not only a procedural irregularity, but a conflict of interest as well.

There is no dispute between the parties that the 2002 Plan Statement does not require payment of benefits to Plaintiffs. However, whether the 2000 Plan Statement requires such payment is contested. If the 2000 Plan Statement does require payment to Plaintiffs, it must be determined whether the retroactive application of the 2002 Plan Statement was a procedural irregularity. On the other hand, if it can be determined that Defendant did not abuse its discretion in determining that Plaintiffs should be denied payment under the 2000 Plan Statement, then Plaintiffs' argument that Defendant wrongly applied the 2002 Plan Statement retroactively need not be reached.

The Eighth Circuit has set forth a five factor test to determine whether discretion has been abused: (1) whether the interpretation is consistent with the goals of the plan; (2) whether the interpretation renders any language in the plan meaningless or makes the plan internally inconsistent; (3) whether the interpretation conflicts with ERISA; (4) whether the interpretation has been consistent; and (5) whether the interpretation is contrary to the clear language of the plan.[5] Finley v. Special Agents Mut. Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992). In particular, "significant weight should be given to such a misinterpretation of unambiguous language in a plan." Lickteig v. Business Men's Assurance Co. of America, 61 F.3d 579, 583-84 (8th Cir. 1995).

Plaintiffs argue that under the 2000 Plan Statement, clear language provided that the

---

[5] Although all five factors are to be considered, not only is clear plan language heavily weighted, but in this particular instance, the other factors do not sway to one party or the other. As a result, only the plan language will be analyzed closely.

Principal Sponsor of the plan was responsible for payments to participants, while Defendant claims that only the Employer was responsible for payments. The 2000 Plan Statement defines "employer" as: "[T]he Principal Sponsor and any business entity that is an Affiliate of the Principal Sponsor that employs persons who are designated for participation in this Plan." Sanford Aff. Ex. B. at § 1.2.10. The 2000 Plan Statement also defines "Principal Sponsor" as NSP (now Xcel Energy). Id. at § 1.2.21.

Two other sections of the 2000 Plan Statement are critical to determining who is responsible for payments to Plaintiffs. Section 5.2 of the 2000 Plan Statement states: "Upon a Participant's Termination of Employment, the Principal Sponsor shall commence payment of such Participant's Account . . . ." Id. at § 5.2 Section 10.2, however, titled Source of Payment, states: "Each Participant, Beneficiary or other person entitled at any time to payments hereunder shall look solely to the assets of the Employer for such payments . . . ." Id. at § 10.2.

At a minimum, the 2000 Plan Statement raises a question as to whether Defendant abused its discretion in denying Plaintiffs their benefits. Defendant's position hinges on the language of Section 10.2, which states that a Participant must look solely to the assets of the Employer. Defendant argues this requires Plaintiffs to seek recovery only from NRG, not Xcel Energy. However, the 2000 Plan Statement's definition of Employer, on its face, is much broader than simply the entity a Participant worked for – it also includes the Principal Sponsor, as well any entities under the Principal Sponsor. Thus, a plain reading of the definition of Employer could indeed include Xcel Energy; therefore, Plaintiffs may be entitled to compensation from Defendant. The most heavily weighted Finley factor requires a plan to follow clear plan language. Here, because the 2000 Plan Statement language suggests Defendant

may have abused its discretion, summary judgment may not be granted at this stage.

If the 2002 Plan Statement was appropriately applied retroactively, any abuse of discretion caused by Defendant in regard to its interpretation of the 2000 Plan Statement is without consequence. However, serious factual issues arise as to whether Defendant should have applied the 2002 Plan Statement retroactively. The 2002 Plan Statement was not signed until January 6, 2003, months after Plaintiffs were discharged from employment. According to both the 2000 and 2002 Plan Statements, a new Plan Statement may not be retroactively applied if the amendment is adverse to the Plan participants. Sanford Aff. Ex. B at § 7; Ex. C. at § 7. Again, the language in the Plan Statements is clear, and therefore raises a genuine question of fact defeating summary judgment.

### E.     ERISA Section 510 (29 U.S.C. § 1140) Claim

ERISA Section 510, codified at 29 U.S.C. § 1140, makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled" under an ERISA plan. Under Section 510, an employer may not discharge a participant or interfere with the attainment of a participant's rights under a plan based on the participant's exercise of the right to which the participant is entitled. Kinkead v. Southwestern Bell Telephone Co., 49 F.3d 454, 456 (8th Cir. 1995). "If the claimant is able to establish a prima facie case of a violation of § 510, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer does so, the burden shifts back to the claimant to prove that the proffered reason is pretextual." Id. To make a prima facie case of a Section 510 violation, a plaintiff must

"demonstrate the existence of a causal connection between participation in a statutorily protected activity and an adverse employment action." Id.

Here, Plaintiffs claim Defendant violated Section 510 by discharging them from employment and interfering with their benefits. In regard to Plaintiffs' claim of a violation related to their discharge, Plaintiffs have failed to demonstrate a prima facie case. Plaintiffs have failed to proffer any evidence to permit an inference that their discharge was related to any right they exercised in regard to their ERISA claims. Moreover, the record does not indicate that Plaintiffs attempted to exercise any ERISA rights prior to their discharge in June 2002. Following their discharge, Plaintiffs began pursuing severance and deferment benefits. Thus, the discharge could not have been for retaliatory purposes related to Plaintiffs' exercise of rights. As a result, Plaintiffs have failed to demonstrate a prima facie case, and Defendant's Motion is granted with respect to Plaintiffs' Section 510 claims as they relate to discharge.

Plaintiffs also allege that Defendant interfered with the exercise of their ERISA rights in contravention of Section 510. Plaintiffs proffer two pieces of evidence in support of this allegation. First, Plaintiffs argue the Defendant amended the Plan following the initial denial of payment to Plaintiffs to specifically exclude Plaintiffs from receiving benefits. Plaintiffs also cite to a statement made by Xcel Energy's CEO to Plaintiff Mataczynski that "the executives at NRG would never get the packages they were expecting." Mataczynski Aff. ¶ 6. Assuming Plaintiffs have mustered a prima facie case, Defendant argues, as discussed previously, that the 2002 Plan Statement was not directed at Plaintiffs; and in any event, the same result is arrived at from the application of the 2000 amendments. Although a fact question exists as to whether Defendant abused its discretion by violating plan language, the standard Defendant faces in

rebutting Plaintiffs' prima facie case of a Section 510 violation is different, that is, whether it can "articulate a legitimate, nondiscriminatory reason" for its action. Kinkead, 49 F.3d at 456. Here, Defendant argues the Plan language is clear under either the 2000 or 2002 Plan Statements, and dictates that Plaintiffs are not entitled to the deferred income. Defendant has adequately rebutted Plaintiffs' prima facie case by offering a nondiscriminatory, legitimate reason for its actions.

Thus, the burden shifts back to Plaintiffs to demonstrate that Defendant's actions were pretextual. In this regard, Plaintiffs again rely upon the comments of Xcel Energy's CEO indicating that Plaintiffs would not be receiving the compensation they were expecting. This comment, without further evidence of prejudice against Plaintiffs, is not sufficient to demonstrate pretext. First, the comment itself could be construed in a number of ways. It may have been a comment as to the CEO's belief that the fact that NRG was teetering on bankruptcy would ultimately prevent recovery by Plaintiffs. Thus, it is not obvious that the statement indicates bias. Second, Plaintiffs have proffered no evidence to allow an inference of a causal connection between Xcel Energy's CEO's expression and the decision by the plan administrator to deny Plaintiffs' benefits. Without more evidence of pretext, Plaintiffs' Section 510 claim can not survive Defendant's Motion.

**F.      Stock Options and Unjust Enrichment Claim**

Plaintiffs Bender and Mataczynski allege claims related to the failure of Defendant to grant them stock options allegedly owed to them under the Severance Plan. In response, Defendant asserts that Plaintiffs Bender and Mataczynski failed to file proper releases with Defendant to trigger the 24 month exercise period to which they claim they are entitled. In exchange for benefits due to them under the Severance Plan, Plaintiffs Bender and Mataczynski

were required to submit releases to NRG. Although they did tender releases upon their discharge from NRG, Plaintiffs Bender and Mataczynski did not submit the releases required by the Severance Plan. Cf. Sanford Aff. Exs. P, Q at § 11.2; Bender Aff. Ex. I; Mataczynski Aff. Ex. D with Mataczynski Aff. ¶ 12, Ex. E; Bender Aff. ¶ 12, Ex. J. Benefits plans may validly require the release of employment-related claims to vest severance benefits. Petersen v. E.F. Johnson, Co., 366 F.3d 676, 680 (8th Cir. 2004). Plaintiffs refusal to submit the releases provided by Defendant allowed Defendant to deny them stock options. Accordingly, Plaintiffs Bender and Mataczynski's claims for stock options can not survive judgment.

Plaintiffs Bender and Mataczynski also claim Defendant has been unjustly enriched by its failure to grant them the stock options. Under Minnesota law, unjust enrichment claims are subject to three necessary elements: (1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it. Action Constr. Co. v. State, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986). Here, Plaintiffs Bender and Mataczynski claim Defendant retained a benefit by accepting the work of Plaintiffs without providing them promised compensation in the form of stock options. This argument, however, can not withstand scrutiny. As Defendant notes, there is no cost to Defendant if Plaintiffs were to exercise their stock options. Consequently, there is no benefit retained by Defendant. Therefore, a cause of action for unjust enrichment can not lie.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Motion for Summary Judgment [Docket No. 21] is **GRANTED** in part as to Plaintiffs' Section 510 claim and Plaintiffs Bender and Mataczynski's breach of contract and unjust enrichment claims, and **DENIED** in part as to Plaintiffs' denial of ERISA benefits claim.

BY THE COURT:

      s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 26, 2005.